Our first case on the docket today is agenda number 11, number 129263, Robert Cammacho et al. v. City of Joliet. Counsel for the appellant, are you prepared to proceed? Good morning. May it please the court. My name is Todd Lundin and I represent the City of Joliet. The plaintiffs in this case are all commercial truck drivers, who the City of Joliet cited with a violation of 19-21 of the City Code, which is its overweight ordinance. There is no dispute that they violated this ordinance. The only issue in this case is whether the City of Joliet had jurisdiction to administratively adjudicate these offenses. The appellate court in this case, relying on Cadham Trucking v. City of Chicago in 2011 Illinois App First 101-146 held that Division 2.1-2 of the Illinois Municipal Code limited home rule authority. That that division contained three exceptions and that 19-21 was a traffic regulation governing the movement of vehicles. Ultimately it held that the City did not have jurisdiction to administratively adjudicate its overweight ordinance. The City asked this court to reverse the appellate court because the General Assembly in Division 2.1 did not expressly preempt the City's home rule authority to administratively adjudicate this ordinance and in the alternative, this Division 2.1 does not preclude administrative adjudication. I'd like to first start by talking about Joliet's power as a home rule unit. This power is derived from the Illinois Constitution. The home rule powers of Joliet and Joyce are broad. To limit these powers, the General Assembly must expressly limit this authority and these powers are construed liberally. The purpose of these home rule powers through the Constitution is to allow local municipalities to solve local problems. Two home rule municipalities may solve different problems differently, but it's up to those local units to solve those differently. Those municipalities know how to solve these problems. The statute at issue is in the Illinois Municipal Code. I'm going to refer to it just as Division 2.1 for simplicity. This Division 2.1 was enacted in the late 90s. Before it was enacted, there were other administrative adjudication codes and the General Assembly enacted 2.1 to give home rule municipalities greater authority to take more cases to administrative adjudication, not less. 2.1-8 provides those greater remedies. It allows a municipality to enforce its orders as though they were through any court of competent jurisdiction. It allows them to recoup attorney's fees and that's the reason 2.1 was enacted. It was not a limitation on how home rule authority or trying to get less ordinances administratively adjudicated. Under 2.1, there is an exception that talks about the fact that the city should not be involved in basically prosecuting something that's a traffic offense already under the vehicle code or a similar offense. Do you have that problem here with this weight restriction? No, and that's where I was going with the alternative. I believe we have home rule authority that needs to be liberally construed. We don't. The first thing, there is confusion between Chapter 11 of the vehicle code and what we administratively adjudicated here, which is an overweight ordinance. Chapter 11 rules the road. It's more the flavor of DUI, leaving the scene. It is not overweight. So are you saying that there is not contained in the vehicle code any law with respect to the weight of trucks? Specifically, no. Joliet's ordinance isn't in the vehicle code. It's different. I understand that. What I'm referring to is how 5.1-2.1-2 talks about the city not being able to regulate a similar offense that is a traffic regulation under the vehicle code. Sure. That number two is kind of a mouthful, and you have to break it down into parts. There's actually two exceptions. The first one is not within the home rule authority of the municipality or statutory authority. Clearly, going to the city's government and affairs, trying to keep overweight trucks out of residential areas goes to that. We clearly have home rule authority for the ordinance. That's not an issue. So number one is really not an issue. I'm talking about number two. Sure, I understand. So under number two, and there was an issue in both Gattom and the appellate court here, whether there was two or three exceptions. I'm arguing that there was just two because of the Roman numerals, and I have other reasons that I'll get to in a minute. As I started before, the first part of any offense under the Illinois Vehicle Code, Joliet's overweight ordinance is not in the Illinois Vehicle Code. There is no direct correlation to anything. The closest is in Chapter 15, but there's nothing identical that was adopted by the city. Is there anything similar? Because of course this says if it's identical or even though it doesn't use the word identical, but it does use the word a similar offense. Sure. No, I'm arguing that there's nothing similar in there. The Gattom court looked at three Chapter 15 violations to say they were similar. They said 15-301, but that requires a permit to be carried by the truck driver. The city's ordinance does not cover that. 15-111 would probably be the closest, but it's also not similar. 15-111 talks about actual weight. It talks about weight per axle. There's a formula. It's a fairly long statute. Joliet's isn't even close to that. It's a vehicle weight rating. The trucks do not have to actually be loaded. No one knows if these trucks were loaded and what their actual weight was. It was their gross vehicle weight rating that triggered the violation. The police officers that gave the citations, they didn't pull these trucks into a weight station like you would see off a highway. It was just the weight rating that every vehicle has exceeded these roads, and that's what triggered it. So 15-111 isn't similar. The intent of that statute is different than what Joliet's intent was. And then the Gattom court looked at 15-112, which excites officers to weigh vehicles and remove excess loads. Joliet's ordinance does not require any of that. The intent of the statute is different than the intent of what the city's ordinance was. They're not similar. And when you're looking at a similarity argument, you have to have a narrow interpretation of that because the city's home rule authority says that the home rule authority needs to be liberally construed. So I'm asking that you take a narrow interpretation of the similarity between the two. The intent has to be the same. It's not here. So this is not the same as anything in the vehicle code. It's not similar to anything in the vehicle code. But is it similar, and as we look at this language here, similar offense that is a traffic regulation governing the movement of vehicles? So I think you're going to the next part. That number two really has, it's a mouthful. There's really three parts there. The next one is traffic regulations governing the movement of vehicles. I'd argue that is a term of art. You don't actually have to go to a dictionary and look at movement. Number two, there's only two Roman numerals, number two. And what the General Assembly is really saying in both of those is they go to safety. And how you know that is you go to the Illinois Administrative Code, which has a force effective law, specifically 92 Illinois Administrative Code, 1030.1. And it defines traffic regulations governing the movement of vehicles, I'm sorry, 1040.2, I'll miss this definition, I apologize, as defined by 92 Illinois Administrative Code, 1030.1, as a violation for which points are assigned pursuant to the Administrative Code. So if we just talk about this for a minute, if we just start at the first part, I think the appellate court looked at this and talked about is this a traffic regulation that governs the movement of vehicles? This is a moving violation, right? And I think you've argued that it's not a moving violation in that it's about the condition of the truck, it's about the weight. Well, the condition of the truck is in 11208.3, which is a completely different chapter of the code. So condition of the vehicles isn't really relevant in this because this is not a chapter, it's clearly not a chapter 11 offense. So it's more about is this regulation that we're talking about, Juliet, a regulation governing the movement of vehicles? No. So in other words, the truck driver is going along, he's on a road that is designated for trucks, and he decides to not take that road and he decides to drive on a different road. Is that a moving violation? No, it's not. Because my argument is it's a term of art that movement of vehicles or the language of traffic regulations governing the movement of vehicles is a term of art that you have to look at the administrative code. And the administrative code basically says those are offenses that points are assigned. And then if you go further and look at the definition of when do you get points, there are offenses that are evidence of unfitness or fitness to safely operate a motor vehicle. And to the next point, the next part of number two is 6-204. It uses the same language. That's when the Secretary of State is supposed to suspend someone's driving privileges when there are offenses that go to the safety. And clearly, Juliet's overweight ordinance does not go to the safety. And that's why there's only Roman numeral number two and not a number three and the except four is because they're saying the same thing. The General Assembly is saying the same thing in number two. There are safety offenses in which points are assigned and the Secretary of State will regard those as offenses of whether someone should get their license suspended or revoked. Really under number two, the General Assembly is saying the same thing the whole way through. They have to be offenses that are in the vehicle code or similar to and offenses that would trigger someone's license to get suspended. A DUI would be a great example of that. That's bearing on someone's fitness to operate a motor vehicle where an overweight violation has nothing to do with that. And that goes to my point that there is really just two exceptions here. Counsel, I'm still stuck. Weren't the trucks cited for the weight? Weren't the drivers cited for the weight of their trucks while they were driving? They could have been. I mean, how can that not go to movement or operation of the trucks? Wasn't it while the trucks were driving that the weight issue was that they were cited for the weight of the trucks? But I don't think our code requires that. But that's not what I'm asking. I'm asking weren't they cited for the weight while they were driving the trucks? Maybe or maybe not. I don't think that fact is known. Counsel, when we take a look at the language of the ordinance, 19-21 talks about it being unlawful to operate any vehicle in excess of 24,000 pounds on any non-designated city road. Well, operate doesn't mean movement. These are intermodal facilities where sometimes there's a line backing them up. They could have been stopped. They could have been parked on the side of the road. But how did they get there? They would have had to move to that point, but at that point where they stopped doesn't necessarily mean they were moving. The movement is just a term of art. It doesn't actually mean that it was moving. Counsel, as I listen to you, basically you're arguing it comes down to driver safety. That's the distinction you're drawing, right? Correct. Driver safety as opposed to it doesn't matter what the violation was on the truck. If it doesn't have anything to do with driver safety, then the city can pass whatever ordinance they want to regarding the regulation. Well, it's not passed the ordinance. It's how it's prosecuted through administrative adjudication. Sure. But yes, it's a safety argument of what is reported because that number two talks about 6204, which is the reporting, and then it uses a term of art, which means the point system. The only time you report both of them is when they're evidence, they're offenses that bear on someone's ability to safely operate a motor vehicle. Counsel, when a vehicle is operating, it's not standing and it's not parked, correct? As I indicated, I believe it's a term of art. It does not have to be moving. But I'm talking specifically about what that vehicle is doing. It's not standing. It's not parked. It is moving. It's operating. I respectfully disagree with that. You can be parked on the side of the road that they're running. It's not in motion, but you could say it's operating. So, no, I don't believe operating equals movement. This Division 2.1-2, at the very least, is confusing. I don't believe there is a clear definition to it. And because of our home rule authority, I believe the tie would have to go to the municipality. It has to be expressed language. In Chapter 11, 208.1 says this. It's a limitation on home rule units is the title of this. Division 2.1 doesn't contain that language. I believe you can decide this case just based on JOLIA's home rule authority, because the General Assembly didn't decide to put an expressed language on 2.1 that says this is a limitation on home rule authority. Before 2.1, there were other administrative adjudication systems, and actually 2.1-10 indicates this does not preempt home rule authority from other systems of administrative adjudication. So, 2.1, there's benefits to it. You can run to court and enforce this just as any other order from a court of competent jurisdiction. So, just because JOLIA does not meet every requirement in Division 2.1, it can have a separate system. It does not have to have the identical system. So, the General Assembly, you know, they decided not to put that limiting language. And in fact, they went further and said you can have other systems. Because before Division 2.1, there were other systems. They didn't want to step in and take those away. They didn't want to say you have to use 2.1. They were very clear that is not the only administrative adjudication system out there. It seems that my time is up. Could I ask you this? Oh, sure. Maybe I'm missing something here. We're talking about moving, moving violation. And you say that's a term of art and it doesn't mean forward progress. Right. Why do you say that? Where is that coming from? What does it mean, what the words mean? Because it's in the administrative code as that language. When you look at 6204, the administrative code, it uses the same language to define. It uses the same language for traffic regulations governing the movement of vehicles. And the fact that they only used a Roman numeral number, too. You can, in the except for, you can deduce from that that what they meant was reporting, was for safety. Not actually the term of art of is the vehicle moving. Can I ask you another question? Another hard question. Yeah, sure. Grammatic, grammar problem. What does the statute mean when it says except, one, two, move in violation, and accept the points idea? What does that second and accept mean? What function grammatically does it have in that clause? My argument is that second except language is because it's the same thing they're saying. And number two, both conditions are really the same thing. They go to safety. Despite the fact that the language is different. It says move in violation and accept. Yes. So that would, maybe one way to look at it would be to say that there's a distinction that's being drawn between the two. Maybe, but there's different ways the Secretary of State can suspend someone's license. There's 6204. Then there's the administrative code. So I believe you would have to look at both because it's really the Secretary of State's job. That's the Secretary of State's job is to suspend license. And as you indicated, it's not 100% clear. That number two is not 100% clear. And due to Joliet's whole rule of authority, I believe you have to look at that narrowly. And on Joliet's side, because the whole rule of authority is to be construed liberally. Thank you. And counsel, counsel for the appellee. Good morning, members of the court. Mr. Muncy, may it please the court. My name is Frank Andriano, and I represent, I call them the defendant drivers. I think they're called appellees here. If I could just use the term drivers. I think that this court's recent decision in Linzeris v. City of Chicago is instructive. If the court went through the whole rule of authority of the city of Chicago in fairly exact detail, and went through the authority of the city as a whole rule of municipality, and started out with 11-207 talking about what no local authority can do and enact regulation in conflict with this chapter unless specifically authorized. And in Linzeris, the court was able to point to, for the administrative toll fees, a change that the General Assembly enacted. And one of the things that's clear is both in this court's promulgation of rules governing traffic offenses and in the General Assembly's promulgation of rules governing traffic offenses, that there's supposed to be uniformity throughout the state of Illinois. And not only does Joliet's system at loggerheads with that uniformity, it's at loggerheads with the reporting regimes that have been mandated by the General Assembly. There's the Hanover Park case. And I think that this, if I were to be just blunt, I think that this is exactly what the Hanover Park case dealt with when Hanover Park and some other municipalities instituted and commenced their own traffic enforcement regime that would bypass the circuit court and would go directly to City Hall and be adjudicated there and then not reported. I don't know if the court needs to address all of that. My first argument would be, if you look at the City of Joliet's ordinances, this doesn't involve standing, it doesn't involve parking, and it doesn't involve the condition of vehicles. It simply doesn't. So that's what their ordinance is purported to regulate. And I don't think that this is any of those. This is, as counsel indicated, the truck driver turned down a road they shouldn't go down. It's posted, they shouldn't turn down it. They've ignored a traffic, a lawfully posted traffic sign. Don't go down this road. And they turned. I can tell you why they turned, but it's not really important. They turned down these roads to get to an intramural facility in Joliet. Joliet is a legitimate interest in protecting the roads. Joliet is a legitimate interest in making sure the trucks don't turn down the roads they turn down. And the really simple answer is, pull them over, and they do. Write them a traffic citation. Have them go to court and have a judge adjudicate it. What they do instead is... Counsel, what's the traffic citation for? The traffic citation and actually appendix page 116 of Joliet's brief, they actually have copies of the tickets. And it just, it's not in the form that... I'm talking about your alternative proposal. Oh, I'm sorry. Disregarding the traffic control device, that's one. Overweight, over length, over width on a road. There are citations they can write them for. Under the vehicle code. Under the vehicle code. They could, if they wanted to, take them to a weigh station, weigh them and write them for an overweight ticket under 15111A. There are limitations on where trucks can be, how much they can weigh, and where they can go. So even here in Springfield, I'm sure that if we had semis coming right down this particular street, that's probably not allowed. There's places where they can turn and not turn, and they're turning down residential roads. Joliet's one of those great, I haven't had trouble there, so I think it's great. It boomed, and there was some outlying subdivisions that were bucolic, and now are in the middle of big truck traffic. And the trucks turned down these residential roads, and Joliet's trying to prevent that. Is there a safety concern in this ordinance? Is there a safety concern? Sure there's a safety concern. You don't want semi-trucks driving down residential roads. They're big. They don't stop that well. Some kid rolls out in the middle of the street or plays on a bike. You don't want a semi-truck going down a residential street. I think it's absolutely a safety concern. But what it is is the movement of vehicle. There is a way under the vehicle code for a policeman to pull over a vehicle, say you're not supposed to be here. Here's your traffic citation. You're disregarded your traffic control device. You're overweight on a residential road. You're barred from being on a residential road. Joliet does a good job, and they are trying to protect the people who live there. They're posting signs everywhere. So if you turn down the road you're not supposed to be on, they have a lot of things they can do to stop that. But the statute at issue talks about movement of vehicles and reportable. I've noted in CATM, the prior decision involving the city of Chicago, CATM made the finding that these are the movement of vehicles because they are moving down the street. They shouldn't be on, just like if I drove the wrong way on a one-way street, and reportable. Okay, so CATM said these aren't reportable. Now everything is. Everything gets reported. The General Assembly has said everything you do in a semi gets reported. I read the city of Chicago's amicus brief, and I appreciate Mr. Lindsay's argument, but they're simply wrong because the state of Illinois has adopted the CDLIS system, and the federal government has implemented the SAFER system, Safety, Accountability, Records, Electronic Records Act. So on your tickets that the Supreme Court has, and I put this on page 20 of my brief, if you look at your ticket that is the standard uniform ticket, it's got a point, are you a CDL operator, yes, no. Officers got to check. And they have a box for the DOT number. Because if you're an individual driver, I can get my driver's license suspended if I get too many tickets, and anybody can whether you're a CDL operator or not. That's how you track the CDL operator. The DOT number goes to the company. So if you're running a company that's got too many tickets, that's also all categorized. It's all recorded, and it's all reported because the Illinois General Assembly says you have to, because the federal government says you have to, and Illinois adopted it for part of roadway money and everything. But everything gets reported so that you know if you've got a trucking company with too many tickets, if you've got a driver with too many tickets. It's all part of a comprehensive scheme. And the city of Joliet is avoiding that particular scheme. Now, I'm not saying the drivers should do what they did. They shouldn't. But the city cannot do what it's doing. There's a proper way. You write them a traffic citation. You go in front of a judge. The judge sets the penalty. It's adjudicated. The clerk makes the report to the secretary of state. The secretary of state makes the following reports as they are mandated. And so there is a comprehensive scheme, and I think that Joliet's adoption of this frustrates the scheme. It's at loggerheads with the scheme. And it deprives the secretary of state with the information that must go into the secretary of state's computers and then be reported forward because you have to remember a lot of these drivers, and they have their addresses on there. They're not from Illinois. The Illinois secretary of state can't do anything to a guy from Missouri, to a guy from Kansas, to somebody who's not from Illinois. An Illinois secretary of state has only limited authority over somebody who is an Illinois driver. That gets reported out nationwide because truck drivers go nationwide. And so that information goes through a central clearinghouse. There is a reason it's set up like this. And to have a system where if you turn down and ignore a sign, and you turn down that road, where you get a ticket, but that one nobody gets to know about. But if you turn left and you go down a county road, and the county officer's there, so if you have Route 53 and you turn right, the Joliet officer can write you because you're in Joliet. Turn left, the county guy can get you because you're still not supposed to go down that part of the road. The county ticket goes into the system. You go to the judge, the judge does what he or she does, and it gets reported down in the federal government and all the reporting. They do what they do. But if you turn right, you get a higher fine, but nobody gets to know about it because it sits at City Hall. That's why there's a comprehensive reporting system, and that's why Joliet's system does do violence to the reporting regime that the General Assembly has mandated in the same way that in Hanover Park, they were writing what they called P tickets, I think is what they called them. And as long as you went to Village Hall, paid your money, nobody knew about the tickets you got. So I think it's the same as Hanover Park. I think that this Court's recent opinion in Linzeris lays out the differences between Hanover Park and the municipality's ability to charge fines for impounds and get things out of impounds. I think this is just a moving offense, just like any other, and that's why I think that the city's scheme doesn't pass muster. So a moving violation is—all moving violations are reportable offenses? If you're a CDL holder, yes. If you're a CDL holder and commit a violation in a CDL, the General Assembly said, everything you do gets reported. Now, for me and you, not everything that I would do in my personal vehicle park up front would be reportable. And the reason for that is that the General Assembly has adopted into the Motor Vehicle Code the Federal Motor Carrier Safety Regulations. And that's part of our vehicle code. So a state trooper could write a ticket, no mug flap, as the easiest example. Well, we don't have mug flaps on our vehicles. That one, the owner's secretary of the state could consider it a nothing. They might have not assigned points, probably not. But it goes into the system because it shows that—that's why they have that DOT number— that you're not running a trucking company that's following the rules and properly equipping your motor vehicles and you get tagged for that. So the General Assembly's cut out a subsection of what is reportable. So if there's moving, we could agree a mug flap's not moving. That's a nothing. It still gets reported because it's an equipment violation, and it goes into the system so that we know that the company— that DOT number, that's not the driver's DOT number. That's on the side of the—when you drive back to wherever you're from. You'll see trucks on the side. I'm going to put this. They have an MC number, motor carrier. They have a DOT number. Those go to the company. And so if you're running a company that doesn't properly equip its vehicles, that goes all into the system, and the Federal Motor Carrier Safety Administration can come down and say, you've got a problem with proper equipping, and there's all kinds of stuff that troopers can write that's not moving. Hours of service is a great example. You and I can drive. I can get in the car and drive to Florida and drive 24 hours, not against the law. Truck driver, yeah, you can't drive. There's 24 hours in a day. You can be on duty 14. You have to be off 10 consecutive hours. You have to drive 11 hours, but then you're 14. If you go over those hours, that's a violation. Now, that's a big violation because, like airline pilots, you don't want these guys on the road day after day after day after day, violating, violating, violating, wherever you and I can drive to Florida, and I can sleep two days while the kids go to Disney. There's rules that apply to truck drivers that don't apply to anybody else,  because the federal government said you have to if you want roadway money, so they adopted it. And that's why the training of truck drivers is different. Are weight-based ordinance violations reportable also? It's absolutely reportable, and it's only reportable because, and this is where the city of Chicago and Joliet is a little bit wrong, is they're looking at it as a passenger car driver. The act specifically says reportable, everything except a parking violation, if you're a CDL holder or operator, is reportable. Everything goes into the system. What the feds do with it is up to them. But everything except parking goes in. What about standing? What about standing? Is that going if the truck is just standing on the park? I don't know how a truck, but that would not be unless you're on a public roadway. I suppose it would be illegally if you parked it, but none of these have anything to do with standing or parking. They're trying to get into the intermodal facility that, at least on these ones, they're going down roads they shouldn't go to to get to where they're going. As far as standing, well, if it's not parking, it does say everything except parking. So if it's not parking, then it gets reported. So they carve that out. But there is an overall safety regime here as to why everything gets reported. And Joliet's system just simply doesn't, it's not in comportment with that. So that's why I think that they're incorrect in their legal analysis. If you really have any questions, I'll sit down. Thank you very much, counsel. Rebond? I have two things. Mr. Andrew, on the site of Hanover Park, this is the same as Hanover Park. The court in Hanover Park was clear. They limited their decision just to Chapter 11. It was very clear that it didn't go to 15 or 13, any of the other chapters. And there's no dispute here that this is not a Chapter 11 offense. So Linzeris and Hanover Park, Linzeris dealt with Chapter 11 too. And the difference between that is Chapter 11 actually has a uniformity provision within it. It does not apply to Joliet's overweight ordinance because not a Chapter 11 offense. So the uniformity argument just doesn't apply here. And as to Mr. Andreon's argument of everything's reportable, I disagree with that. I think where he's getting at is 6-204, which is set up where there's an A and then 1, 2, and paragraphs underneath of it. One of the paragraphs says the reporting requirements of this subsection A apply to all violations listed in paragraph 1 or 2 of this subsection A, excluding parking violations, when the driver holds a CLP or CDL. But you have to look at subparagraph A because it's A and then everything under it. What I just read was under paragraph A. So you don't have to report under A above. The others don't matter either. And A says what gets reported is evidence of safely operating a motor vehicle. Joliet's ordinance of operating overweight rating violation has no bearing on whether someone can safely operate a motor vehicle. That is just not the law. It is not reportable. And then he mentions the federal scheme. Federal scheme is you can't preempt home rule authority with that. I would like to point out the case Roman v. The City of Chicago, which dealt with the City of Chicago having a mandatory minimum 90-day jail sentence. The argument was that there was a comprehensive scheme within the criminal code that would prevent the City of Chicago from having a mandatory minimum. This court actually said that criminal code, the sentencing provisions in the criminal code, are actually pretty comprehensive. But that is not the law. You have to have an explicit statement. Mr. Andreano didn't point out the federal guidelines where it says an overweight rating has to be reported. He said it's a scheme which is just not good enough here. Joliet has home rule authority and there has to be explicit statements by the General Assembly. General Assembly knows how to do this. They actually have a statute on statutes that say they have to do it. Home rule, no act. None of that is in 2.1. So for those reasons, I believe Joliet has authority to administratively adjudicate these offenses. And if there's no more questions, I'll conclude. Thank you. Thank you both very much for your arguments. This case, agenda number 11, number 129263, Robert Camacho, et al. v. the City of Joliet will be taken under advisement. Thank you very much.